PAUL E. POLSON v. DALE W. MORTON AND OTHERS.

114 N. W. (2d) 685.

April 19, 1962—No. 38,259.

*Joe A. Walters, Thomas A. Keller III,* and *O'Connor, Green, Thomas & Walters,* for appellant.

*Levitt & Palmer,* for respondents.

KNUTSON, CHIEF JUSTICE.

This is an appeal from a judgment entered pursuant to findings of fact, conclusions of law, and order for judgment in favor of defendants after a trial by the court without a jury.

The facts may be briefly stated as follows: New England Furniture Company, referred to hereinafter as New England, was a corporation engaged in the furniture business in Minneapolis. It was also a lessee of some property within what is known as the Hub Shopping Center. In May 1956 it became apparent that New England was in financial difficulties. Charles Harris, its president, instructed its attorney to call a meeting of local creditors to discuss what could be done. The meeting was held in the office of the attorney in April or May 1956. Plans for liquidating New England were discussed. The corporate defendants in this action were creditors of New England. Among those attending the meeting were defendant C. W. Bronstein, representing United States Bedding Company; defendant J. H. Bramson, representing defendant Levin Bros., Inc.; and either defendant Dale W. Morton or some other representative of defendant Baker Properties, Inc. Bronstein also represented Charles Manufacturing Company, another creditor of New England. Attorney William Kronebusch was also present, representing a number of New England creditors, and other creditors were also present.

At the meeting, the creditors were informed that New England was the lessee of the Hub Shopping Center lease, which contained a provision permitting the lessor, American Shopping Centers, to cancel the lease if the lessee suffered bankruptcy or insolvency and that some value might be realized for the creditors if the lease could be resold to the lessor.

Within about a week after this first meeting, a second meeting of New England creditors was held in Minneapolis at the office of New

England. This meeting was attended by Bronstein, Bramson, Morton, Kenneth Owen, who was New England's attorney, Kronebusch, Harris, and a Mr. Mason, secretary of New England. In addition, representatives of certain Chicago creditors were present, as well as representatives of other local creditors who had attended the first meeting. At this meeting, Harris reported that he and Owen had not been successful in reselling the lease of the Hub Shopping Center, and the creditors were requested to cooperate by not pressing their claims through litigation or bankruptcy proceedings in order that the surrender value of this lease would not be lost through termination. It was reported to them that an assignment for the benefit of creditors would result in termination of the lease.

During the meeting, Harris and Mason were asked to leave the room while the creditors conducted a discussion among themselves. At this time the creditors decided that Bronstein, Bramson, and Morton would comprise a committee to work with New England and to communicate with creditors. It is the claim of those three defendants that at all times they acted only as an advisory committee for the creditors. Plaintiff, on the other hand, contends that they were assignees for the benefit of creditors.

Following this meeting, letters were mailed to the creditors on letterheads of Levin Bros., Inc., informing them of a general plan of liquidation and requesting their indulgence while the Hub Shopping Center lease was disposed of. The first letter called their attention to the fact that an independent auditing concern had been retained by this advisory committee to audit the books of New England. There were approximately 230 creditors with claims totaling some $240,000. The inventory of New England was finally sold to Boutells. A downpayment of $100,000 was received, and, in order to avoid garnishment by creditors who would not abide by the agreement to refrain from commencing litigation, the money was deposited in a Rochester, Minnesota, bank. The money was to be withdrawn on the check of Charles Harris, countersigned by a member of the so-called advisory committee. The fixtures belonging to New England were later sold by auction sale. The resale of the Hub Shopping Center lease failed to materialize, and it was later assigned to a separate corporation consisting of a wholly owned subsidiary of New England.

The names and addresses of the creditors of New England were procured by the committee from Harris or the New England officers. They were eventually paid a first dividend of 26 percent and a later dividend of 3.65 percent.

Plaintiff operated a jewelry outlet under arrangement with New England. Claiming that he had money coming on this arrangement, he filed suit on April 20, 1956. Upon learning of the transactions regarding the purported liquidation of New England, plaintiff through his attorney sent defendant Bramson a letter in August 1956 informing him of plaintiff's claim. A meeting was called at which Harris emphatically stated that New England owed plaintiff nothing; that his claim was being contested in court; and that nothing would be paid thereon. Plaintiff did nothing to protect his rights and took a default judgment in the sum of $18,586 on July 10, 1957, some 5 months and 10 days after payment of the last dividend. A few days thereafter, New England was declared a bankrupt, and out of the assets in the bankruptcy proceeding plaintiff would realize less than one percent of the amount of his claim.

After a trial, the court found that defendants Morton, Bronstein, and Bramson were at all times acting only in an advisory capacity to Harris and that there had been no assignment for the benefit of creditors. In addition to the claim that defendants were acting in a fiduciary capacity as assignees for the benefit of creditors, plaintiff claims that the assets of New England constituted a trust fund for the benefit of all creditors, including himself.

The only question involved here is whether the evidence sustains the court's findings that there was neither an assignment for the benefit of creditors nor a trust fund created for them out of the assets of New England.

■ At the outset, it is clear that there was no statutory assignment for the benefit of creditors under Minn. St. 577.01. We have, however, long recognized common-law assignments for the benefit of creditors independent of statute. Lucy v. Freeman, 93 Minn. 274, 101 N. W. 167.

Under either statutory or common-law assignment, it is elementary that title to the property passes to the assignee and that the assignor

must part with his whole interest in the thing assigned. Banning v. Sibley, 3 Minn. 282 (389); 4 Am. Jur., Assignments for Benefit of Creditors, §§ 2, 97; 6 C. J. S., Assignments for Benefit of Creditors, § 10.

■ The evidence in this case amply sustains the court's findings that there was no assignment for the benefit of creditors. Not only did New England actively participate in all phases of the disposition of its property and the determination of the creditors to whom the proceeds were to be paid, but it retained control over the proceeds. Checks drawn on the fund deposited in the Rochester bank were signed by either Harris or Mason, officers of New England. It is true that New England did grant the advisory committee some control over these funds, but the committee at no time had authority to draw on the account without the signature of either Harris or Mason. It is also significant that the money was deposited in the Rochester bank in order to avoid garnishment or attachment by recalcitrant creditors. If there had been an assignment for the benefit of creditors, the funds would not be subject to attachment by creditors and there would have been no necessity for placing the money in a bank where creditors who were unwilling to cooperate could not find it.

Plaintiff's theory of a trust fund is equally untenable. The cases he cites involve the exercise of equity powers of the court to conserve the assets of an insolvent corporation for its creditors. The simple answer to this contention is that plaintiff took no action to invoke the equity powers of the court. He sat silently by while the corporation liquidated its assets and distributed the proceeds thereof to those whom it considered its creditors. He now seeks to hold defendants personally liable although they were in no way acting for him or in any fiduciary relationship to him.

The case involves only a question of fact, and the court's findings are amply sustained by the evidence.

Affirmed.